The next case today is United States v. William Facteau, Appeal No. 21-1080, and United States v. Patrick W. Fabian, Appeal No. 21-1082. Attorney Weingarten, please introduce yourself for the record and proceed with your argument. It's Reid Weingarten. May I please report? I represent Bill Facteau. So in our brief, we included arguments, due process, and of course the First Amendment. I'd like to start with due process, if I may. And I'd like to start with the new interpretation that the government determined was appropriate in this case for intended use, which we respectfully suggest completely skewed the trial. And I'd like to start with the proposition that the government simply cannot move regulatory goal posts without advance notice, and this is precisely what they did in connection with their interpretation of intended use. Now the government challenges whether or not there's actually been a change. We refer the court with all respect to our brief, and in particular, the cases we cite on page 31 and 32, and rest with that. But we do want to supplement one piece in connection with something called the Troy letter. The court may recall that in 2002, the general counsel of the FDA wrote a letter establishing our definition of intended use. Nowhere in the letter is anything referred to the all-circumstances theory that the government put forward at our trial. We think it's compelling evidence. I would simply like to supplement the fact that the Troy letter, which the government, of course, dismisses as not important at all, was on the FDA website from 2004 to 2017, and they took it down right after our trial, which we think is entirely consistent with our view that the, quote, all-circumstances theory that they maintain is what intended use is all about, is absolutely a newfound device that they seized upon after the First Amendment litigation, because, of course, with the First Amendment litigation, all their prosecutive theories are put at risk. Now, this is... Nelson, let me ask you, you mentioned that you found that this was taken from, the letter was taken from the webpage. That was not presented, or even after trial, to the district court, am I correct? That's correct. We just stumbled upon that. I just wanted to share that with the court. Okay, but what remedy would that have now? Isn't that for a, you know, post-conviction motion to reopen the case based on new evidence, or? No, I mean, I don't think it's that significant. I just wanted to point that out to the court. The Troy letter is, I think, extremely important. The general counsel wrote a letter utterly inconsistent with the government's present theory. And, of course, you're all right, the point I just made makes it even stronger. Okay, so what I really want to emphasize is how this... I'm just puzzled about why it's such a... It just seems like such a commonsensical notion that if you're trying to figure out objective intent, principles involved, that you would look at, yes, you will look at external communications, representations that were made publicly about a divisive issue. But also seems to be, again, as a common-sense proposition, highly relevant if there are internal communications from the government. But ultimately, what they're trying to accomplish with the external representations, what... I mean, that just strikes me as a perfectly sensible proposition, which doesn't remotely raise any kind of due process concerns. I just don't understand what the problem is. Well, I think the problem is the case is too big when the government prosecuted off-label promotion cases. And this is entirely reflected in the cases we cite in our external promotion. That is strongly supported in our brief and strongly supported by the Troy letter. But to answer your question, how this played out in court is as follows. The government's theory in our case was that we intended to use a new device for purposes that we didn't share with the FDA. We entirely shared them with the FDA. It was entirely clear that we were putting together a device to get catalog into difficult places. And everything we did was consistent with that. The FDA said, you can't do this. You have to go through the pre-market approval process in order to do this. So you were initially for... I would suggest initially forthcoming, did not get the answer that you liked. Nonetheless, went about promoting this very use that the FDA said you could not pursue without the necessary approvals. With respect, your honor, when the FDA said jump, we said how high. Every test they wanted us to perform, we performed. The FDA knew precisely that the great majority of doctors using this device were using it with catalog. We had a symposium or a convention when we had doctors performing using the device with catalog. We approved our 510 case five times knowing full well that the doctors using this device were using it with catalog, not with saline. They had absolutely no objection to this. They knew exactly what we were doing every single step of the way in a fundamental way. They didn't approve it. They were telling you to get more studies, telling you to do more control studies so that you could go through the more formal process. We were endeavoring to do just that while doctors were eating this product up because it was so special. It was a clever device to get medicine in hard to get places and doctors loved it. The FDA knew exactly that that was its purpose. There should not be a prosecution when your regulatory agency is shoulder to shoulder with you, knows exactly what you're doing, is fine with it, and blesses what you do. It almost seems that the FDA had no idea what the government was thinking about in the new all circumstances intended use. Of course, we were wanted to do. We used the stepping stone approach and the FDA was absolutely fine with it. Counsel, what was the device that served as the substantial predicate for the invocation of this 510 process? That substantial predicate was not a device which could deliver the steroid. It was at best a saline delivery device, is that correct? It was just a piece of material that you stick into the sinus to help heal. Part of the stratus was a piece of material that you stuck in the sinus to help you heal. Obviously, the import of the stratus was the clever device that allowed you to deliver medicine to hard to get places, but they were building towards that and the FDA knew it and they approved five 510s. Any other questions? Thank you, Counselor. At this time, Attorney Weingarten should mute his audio and video, and Attorney Libby, if you could please unmute your audio and video and introduce yourself to begin. Yes, good morning, Your Honors. Frank Libby on behalf of Patrick Fabian, and I've asked for a couple of minutes rebuttal. Respectfully, the court should reverse all of Mr. Fabian's 10 strict liability misdemeanor convictions, misbranding and adulteration convictions on this stratus implant that Mr. Weingarten was explaining. It does bear noting that that device helped a great number of sinusitis sufferers and avoided the life of being a sinus cripple. It was something that the doctors truly appreciated and they elected to use it off-label as law permits without any interference from the government. I've got four principal arguments for reversal. I'll go right through them if the court would allow me. First, our lead argument is that 801.4, the regulatory regime that drives the entirety of the government's criminal arguments for misbranding and adulteration, that is intended use in turn turns on objective intent, which is ultimately impermissibly, hopelessly indeterminate and vague, unconstitutionally so. We've invited a prosecution such as this on a shapeless standard, which completely missed the mark with respect to line drawing for manufacturers. Second argument, so-called pivot argument, Mr. Weingarten made brief reference to it. The government pivoted away from its long-standing enforcement practice, widely publicized for communications and activities, and moved towards this all-circumstances, what I call the kitchen sink standard. Everything and anything, they did that without notice to these defendants and they, in fact, did it at a time after all of the conduct that was charged in the indictment, impermissibly unconstitutional. Third, I would ask the court consider is my rule of lenity argument, and that is if the court were disinclined to go the unconstitutional route, it still grounds for reversal if the court were to deem 801.4 simply ambiguous, that is admitting of more than one understanding, interpretation, construction. So long as objectively reasonable, and we say it was, that the prior government's construction of 801.4 limited to promotional claims, external marketing, and the like, would be objectively reasonable and more congenial to his theory. It's the construction we pressed upon the court, the court rejected it, we believe that's error, and we don't, we believe that that's not harmless error. The government didn't brief it, didn't press the point, we don't believe that they can demonstrate that it would be harmless in any respect. Finally, Mr. Fabian's conviction for the strict liability misdemeanors, both misbranding and adulteration on responsible corporate officer grounds, that is, the fact question there and the counter conviction had to do with failure to file a PMA for a new intended use. Counsel, may I ask you, I'm looking at the language of the regulation issue, I hope it's the appropriate one. It says that the intent, the objective intent, is determined by such person's expressions, and I would assume that would cover expressions that are reflected in internal corporate documents, or may be shown by the circumstances surrounding the distribution of the article. That language has been in the relevant regulation for quite some time, has it not? Correct, although the government, if I may, to the consumer as conveyed. Indeed, the intended use is the manufacturer's intended use as conveyed to the consumer. That's substantial there. That stands to reason. It's as if the manufacturer's saying, here's how we intend that you use this. It seems to me that a lot of the debate here about the uncertainty in the regulation applies to a circumstance that is not present in this case at all. It applies to a circumstance in which a company, such as that of the individuals here, may be aware of off-label uses by doctors, and off-label uses are permitted. They're aware of it, and then the question becomes, what can they do to promote those off-label uses? What can they not do? That's been an area of considerable uncertainty, and I understand why that can be problematic. That's not what we have here. What we have here is, from the very get-go, the promotion of a use by doctors, of a use that was never approved by the FDA, an introduction into the FDA, I gather you disagree with that, made clear, required going through this pre-market approval process, and because they didn't do it, that's why they've been prosecuted for a crime. I don't see that any of the uncertainty about the scope of this regulation has anything to do with that particular circumstance. Why is that an inaccurate view of what this case is about? Thank you for the time in question. During the period of time of the indictment, it had to do with avoiding off-label promotion. That is criminalizing the speech that was conveyed to the consumer. That is the doctor here. Stay away from that. That's radioactive. There are ways that the FDA recognizes it around that. The doctor may open the door because the doctor can practice medicine as he sees fit and answer questions about that. That doesn't cross over the line. The distinction here is a critical one, and that is that defendants in this case understood that that is what is to be avoided. Mr. Fabian left in November 2011. He stopped his employment in 2011. Coronia, which was the Second Circuit's decision that said, no, you can't criminalize truthful, non-misleading speech, came out in 2012. It was at that point that the government pulled the switcher its long-standing enforcement practice, widely announced on its website, in the Troy letter, absolutely no dispute, from away from the limited to marketing activity and commercial speech to an all kitchen sink thing. That was what we say is unconstitutional here. That's what we say is unfair. That's in the FCC versus Fox television. It's very clear, Your Honor, you can't do that. We say that that was, and we asked for that instruction in the trial court, and it was denied. And it was on that basis we say that the government did not show and cannot show harmless error. Thank you, Counselor. Your time, you have a question, Judge Helpy? I just simply wanted to just make one point about the responsible corporate officer. Judge Helpy has a question for you. Yes, Your Honor. Microphone is off. Microphone. Sorry, sorry, my mute. Counsel, regarding the intended use, you proposed an instruction to the district judge. The district judge, after the charge conference, provided an instruction, and that was not objected to. Do you have any, doesn't that affect your arguments about intended use? Because the jury's deciding intended use over whatever the judge instructed them. If the court please, I believe the record would show that we asked for an instruction that intended use be, the construction of intended use be limited to marketing activity, to commercial speech. Court denied that instruction, rejected that instruction, went with a larger government proposed instruction of all circumstances, which by the way does not appear anyway in 801.4. We objected after the charge conference to that. I believe that is preserved for trial. Wasn't the judge very clear here that your clients could not be found guilty of criminal conduct for truthful, non-misleading statements that they may have made in promoting the product? What they can be prosecuted for is making statements that reveal an intended use of their product, which never received approval from the FDA. That's, I mean, the criminal act here is nothing that they said. The criminal act here is introducing into commerce a product that had never received the required FDA approval. I mean, that is, that is an act and it's an act that is, becomes criminal because of the, of the evidence, the intended, of the intended use, which was at variance with what, what they had received approval for. And so, the things that they said, that, that, those items are simply used as evidence of their intended use. And ultimately they're not prosecuted for what they said. They're prosecuted for what they did with a specific objective in mind in light of things that they had said. That strikes me as a, I would suggest an appropriate use of things that they had said. It doesn't violate the that they could not be, they could not be prosecuted or found guilty on the basis of truthful, non-misleading speech alone, alone. That was the instruction. So that plus something else, and Mr. Factow's brief goes into great detail about this. You add another piece of evidence that's in isolation, which would be equally innocuous. And on that basis, the, the, the jury is instructed that they could find them guilty of this. That's one. Two is the, is that the, the question of, of speech as evidence of intent, two part, two, two difficulties with that. One is it just speech as proxy. Speech is still being criminalized here. We say under the first amendment, viewpoint discrimination, content, business discrimination, which Mr. Factow's brief goes into great detail, is, is over the line. You simply cannot, that's another way of criminalizing speech. Here, if I may, just put a neatly segues into my responsible corporate officer issue that the sole count of conviction for Mr. Fabian on both adulteration and misbranded had anything to do with failure to file a PMA for a new intended, a new intended use, because that's the, that's the determination here. Somehow they created a new intended use, which, which relates back to 801.4 and its operation. Is it limited to external marketing activity or is it the kitchen sink? We say it has to be the former. There was no notice of the, of the agency ship to the latter. So here failure to file is the gravamen of the actus reus of the criminal act. That's the fact question for the jury. They were charged on a responsible corporate officer theory. What's the responsible corporate of the park theory that somehow the question was, did Mr. Fabian have the authority or power to correct or prevent the violation? That violation is, has to do with regulatory filing. The trial record showed only that he was a vice president of sales, had nothing to do at all with regulatory. The government had used no evidence on that. For that reason, we say that the conviction should not only be reversed, should be judgment of acquittal entered on Mr. Fabian's behalf because of the insufficiency of evidence. Counsel, if I might, this is obviously a case of great complexity and importance. What you have this 2008 forum, which the government attaches considerable significance to Mr. Fabian and Mr. Factor, they both participated in that. And there, I mean, the evidence suggests that there were carefully considered efforts to promote this device or the delivery of steroids. And there were exchanges between doctors and presenters there. And even though understanding at that point, and that comes very much in the wake of a rejection of their argument that they were entitled to distribute this device without going through the pre-market approval process, the FDA had told them that. Nevertheless, your clients at a forum in which this use of the product for the delivery of steroids is essentially promoted. I mean, how does he walk away from participation in a forum like that? If I may, Your Honor, I believe I can recall the circumstances of that science forum. Here, you have the imbalance between what a manufacturer can say and do and what a doctor can do under Section 396. Doctors are free to practice medicine. They have to be free to practice medicine, particularly off-label because their independent medical judgment is going to carry the day without any interference from the government at all. Oftentimes, off-label is in fact, the standard of care. Here, Mr. Factor and Mr. Fabian were very careful in understanding they had regulatory help to assist them in understanding where the line was as to what they could do and say. Here, theyíre dealing with doctors. I donít understand the context. Doctors had for decades been looking on their own with ways to insert a cortical steroid into the sinus area to lessen the inflammation of the ethmoid sinuses, which was the object area of the Stratus device here. Theyíve been doing this on their own. Theyíve been chopping up surgical gloves and inserting steroids on their own to do this. As Mr. Factor and Mr. Fabian reasonably understood it, under the long-time enforcement policies and practices of the FDA, so long as they did not promote that as expressed to the doctors, their version of what the intended use of this device should be, the doctors invariably knew on their own what they wanted. At that forum, thatís a speaking with other doctors about how they could possibly use this to advantage. As it happened, thousands of people were helped by this. In fact, as the court ruled at sentencing, in the course of trial and post-trial and sentencing, there was no patient harm. Thousands of people helped from a life of sinusitis, from a life of being a sinus cripple where the doctors had previously gone in and removed all of the tissue from the sinuses so that all day long, the people who had that surgery would have to manually physically irrigate their own sinus catheters. They donít have to do that anymore. They have this as a way of handling it. As a result of this prosecution, not because the government told them to pull the clearance or insisted that they remove the product from the market, the company, because of the looming presence of this prosecution, removed this helpful device from the market. We say that this was an overreach. This was, in fact, a shapeless standard. This allowed the government to come in and impose its own will on these defendants and, in fact, apply a standard that shouldnít have applied in a civil case, much less a criminal case, with liberty interests hanging in the balance. Any other questions? No. Thank you. Thank you. Thank you, Adam. At this time, Attorney Libby, please mute your audio and video. And if Attorney Cromm could introduce himself to begin. Yes, Your Honors. May it please the Court, Randall Cromm, on behalf of the government. As was indicated by Judge Lopezís questions, we think the argument that the defendants were unfairly surprised by this prosecution ends with a consideration of the terms of the regulation itself, which has been unchanged since 1952, and which, by its terms, includes both the expressions, not limited to those that are externally directed, but also all the circumstances of the sale and consideration of how the product is actually offered and used. All of those kinds of evidence are directly contemplated by the regulation itself, and thatís exactly the kind of evidence that was introduced here. It was in statements of responsible individuals about what the product was for and how they intended to market it, as well as their external marketing statements, statements about how it was distributed, including a marketing campaign that was carefully constructed and executed over a period of years to achieve that result, as well as the regulatory strategy. What do you say to the defendantsí response that the FDA had never used that type of material in prior prosecutions, that it relied solely on the speech? Well, I think thatís simply not supported by the cases they cite. We point to a number of cases, taking a broad view, going back to this court in the V.E. Irons case, stating that any relevant evidence can be considered, and we point to a number of cases, going back to at least the ë80s, in which design information, information about actual use, things other than promotional statements are considered as part of the evidence that can be used to come up with the intended use of a particular drug or device. In the end, what this reduces to is this Troy letter, which I think really has force only with respect to the particular party to whom it was communicated, but it did not itself say that it was limited to only promotional speech. What it said was that intended use is determined with reference to promotional speech. Well, thatís consistent with the regulation, and we havenít argued that promotional speech may not be considered. In this case, there certainly was quite a lot of promotional speech that was no case to support this idea that there was a recent pivot away from a prior position, but in fact, a series of cases over time that have applied the regulation to its full facial effects and consider things like uses, consider things like circumstances of the sale, and that this is entirely consistent with that past practice, which goes on for many years. Well, there seems to be a reference to promotional speech, or with reference to, amongst other things, promotional speech. The former seems to limit it to promotional speech. Right. I mean, I guess our interpretation is that if itís meant to make such a dramatic break with prior practice, it would have said with reference solely to promotional speech. But again, even if itís read more broadly, as we point out, the cases that it cites donít necessarily support the propositions that it states. The parentheticals in the case weíve gone through, some of them are not consistent with what Mr. Troy chose to cite them for, and again, itís not a binding precedent. Itís a single document issued with respect to a single party in response to an inquiry, and it simply cannot create an ambiguity in the application, consistent application of a facially clear regulation that would cause due process concerns. Counsel, but one of the arguments that opposing counsel made was that that was on the website. Thereís no evidence of that, or it wasnít brought to the court below, it was found, supposedly found after, but do you have anything to add to that? I mean, itís news to me, I didnít know either, since itís not in the briefing, that that was removed from the website, and I donít think much can be defined from the correspondence on the website. In the interest of transparency, many people write in for opinions with respect to their specific circumstances and products. Letters are released, and I wouldnít be surprised if they maintain most of them, but I canít, again, the mere fact of something, and again, I donít even know if itís true, but Iím assuming Iíll take it as true, that that would somehow undermine a prosecution that was well within the scope of the regulation and existing practice, that that would change anything. So, in response, I take their argument to be that despite the breadth of the regulation, there was this consistent practice of relying only on external communications, and to the extent that the FDA pivoted away from that without notice, that that would be a due process issue. I guess there are two questions. Do you agree that on due process grounds, it would be problematic if there were a long-standing enforcement practice with respect to the kind of communications that can be considered on intended use, that that would create a kind of due process reliance? And secondly, was there such a problem if there were a sudden shift away from it? Yes, Your Honor. In our brief, we address both those points. With respect to the first, our argument is that essentially what this regulation is describing is the kinds of evidence that could be considered, not the substantive standard, not what it means to intend a use, but simply the kinds of evidence that may be considered. And what we point out is that they havenít identified a case in which a change in the type of evidence, not the change in what it means to intend a use, but what the evidence that the government will look to, would itself raise a due process problem. And one can imagine many circumstances in which the government, for example, could choose to focus on resource constraints, cases in which a particular type of easy evidence is present in drug sales, where thereís a video or some sort of clear evidence, and choose not to rely on other evidence. And then later when it has resources rely on a broader range of evidence, again, thatís not essential to our argument, but we do question whether a change in the kind of evidence to be considered by itself would be a due process problem. But the bigger and more fundamental point is that they simply havenít substantiated the idea of such a change. Itís asserted throughout the briefs, and yet the best they can do is point to a couple of cases in which the court, under the circumstances of the case, focuses on those kinds of communications, but doesnít say that only those communications may be considered, and the Tory letter. And we point to a number of cases going back to at least the 80s, in which a broader range of evidence was considered. And so it simply canít be the case that, you know, that they have established this idea of some sort of recent pivot relating to coronia for any other reason would raise the kinds of due process concerns that they suggest here. They donít characterize it as such, but again, thereís a kind of an estoppel argument being made here in the sense that the FDA, they knew what we were doing. We disclosed to them what we intended to do. And they, by their passivity, I guess, sanctioned exactly what we were doing. So that then, after this awareness, after this inaction, to now prosecute us for doing what they knew we were doing for a long time, that that is, I guess, fundamentally unfair in some way. How do you respond to that? Well, I think the main point is that that simply doesnít reflect reality. And the most key and important way is that they did not ever disclose to the FDA, as both the FDA witnesses made clear, that it didnít function as it was clear to do. The saline clearance was essentially obtained under the false pretense that it would operate, that it would inflate and elute saline, when in fact it was incapable of doing so, as their own demonstrators at SinusForm showed. Saline would run out. It would serve no purpose. We noted that they tried to equate it to the rain stent. Well, that was a plug with a drain in it, a hole that would actually drain the sinuses. This couldnít do that. So it was not like the rain stent. And it couldnít do what they said it did. Thus, there was, itís not a situation in which FDA was operating with full knowledge. They certainly were aware that doctors were using it for that purpose, but they werenít aware that it couldnít fulfill the function that theyíd cleared it for. And they continued to prove it, based on continued misrepresentation, that it could do something that it simply could not. Itís also fair to say that the suggestion that they provided were forthcoming in every respect is not, or by the record, I wonít go through the different instances. There were numerous meetings with the FDA and there was contentious debates over the studies that were needed. The FDA made clear that it did not believe the kinds of studies being proposed would be sufficient to establish the safety and efficacy of the device used with drugs. They went on for many years because they could not come to agreement. So the suggestion that, as one of the attorneys suggested, the FDA said, ìHow high?î is not reflected in reality. In fact, it was contentious and it was based on a fundamental misrepresentation about what does the record support the proposition that at one point they submitted documentation indicating that this Stratus device would be used for the delivery of steroids and argued that this intended use could be sanctioned under the 501 process because there was a device out there that could be considered a substantial predicate for it and that the FDA explicitly said, ìNo, no. If youíre going to use this device to deliver steroids, that requires more studies, more submissions. Basically, it requires the premarket approval process. We think this is not permissible under the 501k process. Does the record support that view of the interactions between the FDA and the company here? Yes, it clearly does. The filing that led to the May 2007 disapproval was specifically asking for the indication, so to speak, what it could be used with to expand to include therapeutics. At that point, Iím not sure it explicitly said steroids, but it said anything other than saline that could be used as a drug delivery device. The response of the FDA was that that would represent a modification that would require further studies and further approvals. It could not be simply sort of grandfathered in as a 510k on the original device on the idea that it was such a minor change that it could be basically accepted as is, but in fact, they specifically said, ìThatís not true,î and entered into discussions, which they conceded over the kinds of studies. Several studies were begun and some were completed to try to demonstrate safety effectiveness of its use with the drug, but they did specifically ask to be expanding its use on saline therapeutics, and that was specifically in May 2007 declined by the FDA in a statement that would represent a modification requiring further studies and approvals. One of the things the government argued is that the use with saline had no therapeutic value and therefore no economic value. Is that something that the FDA would have known when it approved the device in the first place? Well, I think no, and I think thereís an FDA reviewer who was one of the witnesses who testified and testified that she understood that its use with saline could have some function to prevent sort of crusting around it and some sort of problems that might arise. The FDA reviewer, the 510k process is an expedited process and the reviews are not as extensive as they are for other types of devices, but the belief was that it would fill with saline, that it would inflate to keep the tissue separated for a period of time, and that the presence of the saline would prevent crusting or other problems surrounding it when it would be removed. What the evidence was is that that was never going to be the case and that that was conceded by doctors at the presentations where they showed that saline would run out immediately and therefore what it was believed, what FDA sort of assumed for the purpose of the 510k, it was capable of accomplishing, it wasnít, and they werenít aware of that. They donít test devices. They wouldnít have put it on the table and put saline in it to see what it would do. So does the record support counselís assertion a few minutes ago that there were FDA persons present at some of these seminars where doctors were present? There is evidence that at least some FDA people were present. There was no testimony as to what they heard. I mean, to the extent of trying to suggest that they were specifically aware of particular videos that were shown or particular presentations, Iím not sure that the record specifically supports that, but there was evidence that they were present in certain instances. I guess what Iím trying to figure out is that if they were present, I guess, and it does depend upon what they saw or discussed while present, that they would have known at some point that there was no saline value to this, but nonetheless, the 510ks continued to be approved. Right, and again, I think there certainly was no evidence to the specific effect that they were aware, attended a presentation in which it indicated that saline would run out. To the contrary, the consistent testimony, I donít think it was undercut in any way on cross-examination, was that the FDA believed it would function as described as a saline inflating balloon and spacer, and that it approved it consistently on the understanding that thatís what it did, and did not understand otherwise until really after this prosecution had begun. Counsel, could you please address the arguments about what the government had to show with respect to the particular involvement of these two defendants in the introduction of this product into the commercial stream? I mean, thereís a kind of sort of strict liability argument I think the government is making here that if these individuals held the positions they had, the CEO being in charge of sales, if on their watch these devices were introduced into commerce without the necessary FDA approvals, that they are criminally liable even if they had nothing to do with the marketing, the development of the device. Could you please respond to that issue? I think thereís two parts of this that are important to set out. First, as your Honor, in an earlier question suggested, the way that the statute works, the crime is the introduction of an adulterer. It does not require that the defendant personally have participated in the misbranding or the adulteration, and this is clear in Dodderwike and Park, but itís also very clear in this case in Stepanetz where they said the essence of the crime is something qualifies as misbranded or adulterated, and then a person undertakes the prohibited act of distributing it in interstate commerce. So thatís the crime. The crime does not by itself require that a person be involved in the misbranding or adulteration, and because of strict liability, and this again is Dodderwike, doesnít have to actually know that it occurred. The court in Dodderwike was clear that the judgment of Congress was to impose a liability for informing oneself and protecting the public on those in a position to do so and not the unsuspecting public thatís in no position to find out whatís going on before it does. But with respect to the second point, this is not a case that ultimately relies on the sort of responsible corporate officer doctrine, and thatís what the court noted in a footnote, I think itís 140 in its opinion, and what it stated is, because these, well it instructed the jury on responsible corporate officer, it said that these you could look, you didnít have to go to their status alone, but they were directly involved in the design, the marketing, the marketing campaign, the regulatory strategy, and went forward for years knowing that they didnít have approval, and indeed the marketing campaign was geared on the idea, they expressly stated in their presentations, this is only approved for sealing, but inducing the community to use it for an unapproved use. So this was not, it did not, the court found it unnecessary to talk about the responsible corporate officer doctrine, finding that where there was direct personal involvement in the acts, both that made it misrepresented and adulterated, and the marketing, the distribution, there was simply no need to go that further step of looking at their role. Alright, any other questions? No, thank you. Thank you, your honors. Attorney Crum, at this time, if you could mute your audio and video. Attorney Weingarten, you have a one-minute rebuttal, please reintroduce yourself to begin. So, I have one minute and a million things to say. Iíd like to limit my comments right now to one of the questions from Judge Lopez. I want to focus on the FDAís knowledge of what was going on with my client, and Iíd like to draw your attention to events in 2011. This is after the FDA is regulating the product for five years. Theyíve approved four 510s, now theyíre on number five. And they are explicitly told at that time that the U.S. Attorneyís Office in Boston is conducting a criminal investigation into this very conduct. And they are now considering number five, they are told again that the great, great majority of doctors are using this with Catalog, they do a full safety analysis, they do a full analysis of the disclosure language that the company is using, and they approve the device, the fifth 510K, knowing why itís used and calling it a spacer. They donít say, ìOh my God, this company has been lying to us for five years. Oh my God, the intended use of this product, they misled us.î The FDA was never concerned about saline. They viewed it as a benign substance, completely irrelevant to use of this product. Obviously, they could have demanded that a clearance say, ìHow quickly does the saline rush out?î And it turns out, three doctors testified at trial without cross-examination that the saline in the nose, in the sinuses, reacts completely differently than saline on a laboratory bench, and there was no effect of cross-examination to that effect. But the more important point, the FDA was utterly indifferent to the saline. Everybody involved with this product knew what it was about. Everybody knew it was the holy grail for ENTs. Everybody wanted this product because it was so effective, and it just seems absurd to us that a person can be prosecuted when the FDA regulated them, knew exactly what they were doing. The FDA knew. Is there evidence of record that they knew? Well, the 2011 example that I just gave, I mean, it's covered in Exhibit 2586-122. It's a 50-page document. The FDA knew precisely what this device was about. At the same time, they knew that the U.S. Attorneyís Office was conducting a criminal investigation, and they never said, ìOh, my God, we have to rip this product off the market.î Instead, they approved 510K No. 5.  I want to just make sure I understand. You're saying that the FDA received applications from your client disclosing that this Stratus device would be used for the delivery of steroids, not saline solution, steroids, and the FDA said, ìFine. You can market it for steroid delivery in the treatment of these sinus conditions.î I gather you're not saying that. No, of course not. Okay, so you're saying that they received these applications which disclosed the continued delivery of saline solution, so that was fine, but they knew that, in fact, saline solution would not be delivered, but steroids would be delivered, and by approving the device for saline solutions, knowing it would be used for steroid delivery, they were implicitly blessing that delivery system? Is that what you're saying? I think it's more subtle than that. I think they knew for sure that it was a device with two purposes. One was a spacer because you need that with operations in the sinus, and number two, a clever device to get medicine in hard-to-get places. Catalog for sure because that's what doctors use, but other things as well, and the FDA knew that. They weren't even remotely interested in the saline because it was a benign substance that wasn't going to change anything, but they knew exactly from theÖ Well, okay, so 2004, there was a patent application to the U.S. Patent Office where a clearance discloses just that, a device with two purposes. There is testimony that there's a woman named Karen Baker, who was the FDA lady who supervised us, who knew exactly that we were using the stepping stone approach, that we were moving towards a drug indication and encouraged it. I think the 2008 convention is important. We invite the FDA to our tent or whatever it is we had. At the same time, I don't remember exactly what the testimony was, what they saw and what they didn't see, but the centerpiece of our presentation to the world at that conference was catalog. This great device can get the catalog in really difficult places. We weren't hiding from it. We invited them to it. That has to be significant. That is inconsistent with a company who's trying to mislead the FDA. But counsel, hadn't you, not long before that 2008 forum, your client had attempted to get this 501k approval for a device that would deliver and they were told there's no substantial predicate for that. If you want to do that, there have to be more studies. You have to go through a more elaborate process. That was a setback commercially for your client. They had to go about in a more subtle way to try to market this project with a delivery system that they had been told would require further approval. I was the lead trial lawyer. I remember this extremely well. 2007 was a frustration for sure. You're exactly right. What the FDA said to them, this is a combo product. This is both a device and this is also a drug delivery system. You need to get approval for both. The device people loved them. They couldn't wait to get this out there. The drug people bought. That's what happened. Then Clarence's response was, okay, if that's the deal, that's the deal. Yes, for sure, doctors continued to buy the Stratus. They endeavored mightily with help from lawyers not to be inconsistent with the rules. Yes, of course, that was a setback and they continued forward. The FDA knew just as much the day after as they knew the day before. Thank you, counselor. Thank you. Attorney Weingarten, please mute your audio and video at this time. Attorney Libby, please introduce yourself on the record to begin your two-minute rebuttal. Happy to do that. Thank you, your honors. Frank Libby on behalf of Patrick Fabian. If I may, my rebuttal, I'd like to first address this 11th hour effort revisionist history on the part of government. I think it's clear that we have two regimes here with respect to 801.4. One is the pre-Coronia criminalizing off-label promotion where speech was the criminal act. We can't do that anymore. Up until that time, the government's construction of 801.4 was limited to promotional claims, external marketing activities. People had to be careful what they said to the doctor, the consumer, the user, the public. We don't want to create a new intended use in that respect. That was the line. Then after Coronia, without notice to our clients, and in fact, after all the conduct that was bound up in the indictment, we learned about the new standard by way of the indictment. That's how this government operates. That's how we learned that there was a new all-circumstances standard to be applied. We heard from government counsel that it disappointed to hear two things in that respect. One is that somehow V.E. Irons helps them. The briefing is replete here in front of the court that V.E. Irons, in fact, had to do with whether the objective intent could be limited to labeling. No, the First Circuit said in 1957, it's all relevant sources of promotional claims. All relevant sources had to do with promotional claims, not interior internal activity or anything not extended to the public. Two, the Troy letter wasn't offered as a binding matter to somehow bind the government with respect to an executive's letter. It was a restatement of clarity. This is the government's policy. This is what we do. This is how we go about proving and prosecuting these cases, and it has to do with reference to promotional speech. It's difficult to back away from that after the fact. The government tried, but I think failed utterly here. Secondly, the government tried to characterize this as an issue of evidence, an evidentiary issue. It is not. It has entirely to do with the substantive law. Intended use is the fact question. It is the question to be proven at trial. The difficulty is we don't know what it is. After decades, citizen petition after citizen petition, after all this draft non-binding guidance that we get from the FDA, they move the line continually. Here, they did it after the fact. You can't do that under the Constitution. I just don't understand what's nebulous, uncertain about the concept of intended use. Now, there may be some uncertainty about the kind of evidence you can rely upon to prove intended use, but the concept of intended use seems to be pretty straightforward. It's how we want our product to be used. It has to do with 801.4, Your Honor, which has just been muddled forever. DOJ, my brief, Mr. Fabian's principal brief says DOJ stands up and says it has to do with objective evidence only. The FDA says in other public announcements, it has to do with objective and subjective, that is internal things. They cannot agree with themselves. The public is entitled under the Constitution to have clear line drawing, particularly in regulatory matters. It has to be precision and guidance. That's what the case law says. We got none of that here. In fact, we got it after the fact. That's a constitutional due process, fair notice concern, Your Honor. Objective intent is anything but clear. It says other circumstances surrounding the distribution. Well, what could that possibly be? Here, the government says after decades of longstanding practice, we're going to open up the floodgates. It's going to be anything and everything we say. We'll tell you when we see it, and we'll let you know about it by way of an indictment, and that is no fair notice at all. Last thing, finally, if I may, Your Honor, just to conclude, counsel referenced the responsible corporate officer doctrine. It, in fact, has to do with another fact question for the jury, and that is, what was the violation? The violation was the failure to file a PMA, not just so simplistically a distribution of a misbranded or adulterated device. That's not it. That's not it. The question there under part responsible corporate officer, the question for the jury is, does this violation fall within this executive's power authority to prevent or correct? That is the essence of a responsible corporate officer prosecution and convicted here on a record which is absolutely silent on this. In fact, as vice president of sales, he had nothing to do with regulatory filings or FDA. The court did make mention and said that these folks were directly and personally involved. Well, there was no record evidence at all that Mr. Fabian had a thing to do with regulatory filings. He was never in headquarters. He was on the road. He was the vice president of sales. Because there was absence of any trial record evidence on the question central to responsible corporate officer, those convictions have to be reversed. In fact, because it's insufficiency of evidence, not subject to remand for retrial because double jeopardy grounds you're on. Thank you. Thank you. That concludes argument in this case. Attorney Weingarten, Attorney Libby, and Attorney Crum, you should disconnect from the hearing at this time.